## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | |
| **THE ELECTRONIC DEVICES IDENTIFIED IN ATTACHMENT A** | **Case No.**   8:23-mj-02310-GLS |
| **CURRENTLY LOCATED AT THE INTERNAL REVENUE SERVICE – CRIMINAL INVESTIGATION, 601 E NAYLOR MILL RD UNIT C, SALISBURY, MD 21804** | |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANT

I, Brian Gorman, a Special Agent with the U.S. Department of Labor Office of Inspector General ("DOL-OIG"), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION & AGENT BACKGROUND

1.      Federal agents, with DOL-OIG and Internal Revenue Service, Criminal Investigations ("IRS-CI"), are investigating a fraud scheme involving unemployment insurance ("UI") benefits, which are maintained, administered, and operated by several state workforce agencies ("SWA"), and overseen by the U.S. Department of Labor ("DOL").

2.      I make this affidavit in support of an application for search warrant under Federal Rule of Criminal Procedure 41. Specifically, I seek a search warrant to search the electronic devices, described in Attachment A (collectively, the "**ELECTRONIC DEVICES**") which were seized pursuant to the execution of a search warrant at 585 McWilliams Road SE Unit 705, Atlanta, Georgia (the "GA RESIDENCE"):

a.   a black ZTE Z981 cellular telephone, bearing serial number 325167062536 ("**TARGET DEVICE 1**")

b.   a red Apple iPhone displaying a cracked front screen and rear glass ("**TARGET DEVICE 2**");

c.   a black Apple iPhone displaying a cracked front screen ("**TARGET DEVICE   3**");

d.   a black Apple iPhone bearing serial number GTFP19Y0D43 ("**TARGET DEVICE 4**");

e.   a black Apple iPhone displaying a cracked front screen ("**TARGET DEVICE 5**");

f.   a black Apple iPhone, model number A1660 ("**TARGET DEVICE 6**");

g.   a PowerSpec desktop computer, model G509, bearing serial number G50909102157336 ("**TARGET DEVICE 7**"); and

h.   a Nikon D3200 Digital Camera, bearing serial number 3460481 ("**TARGET DEVICE 8**");

(collectively, the "**ELECTRONIC DEVICES**"). In executing the search, law enforcement officers will search the **ELECTRONIC DEVICES** for the items in Attachment B, which is incorporated herein.

3.      Based on my training, experience, and the facts in this affidavit, there is probable cause to believe that:

a.   Michael Cooley ("**COOLEY**") and Alonzo Brown ("**BROWN**") (collectively, the "**TARGETS**") have committed violations of 18 U.S.C. §§ 1028A (aggravated identity theft), 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), 1349 (wire fraud conspiracy), 922(j) (possession of a stolen firearm), 922(a)(6) (false statement with respect to a fact material to the lawfulness of the sale or disposition of a firearm), and 922(g) (possession of a firearm by an unlawful user of a controlled substance) (collectively, the "**TARGET OFFENSES**"), among other federal statutes; and

b.   Records and information associated with the **ELECTRONIC DEVICES** will contain evidence, instrumentalities, contraband, or fruits of the **TARGET OFFENSES**.

4.      I am a Special Agent with DOL-OIG and have been so employed since July 2022. My primary duties are to investigate alleged criminal violations related to matters involving labor racketeering and fraud against DOL programs. Additionally, I am currently assigned to the Maryland COVID-19 Fraud Strike Force, with an emphasis on investigating pandemic-related fraud.

5.      Prior to DOL-OIG, I was employed with the U.S. Postal Service Office of Inspector General ("USPS-OIG") from April 2020 to July 2022 as a Special Agent, and earlier from March 2019 to April 2020 in an administrative capacity. I have attended and completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia. Prior to employment with DOL-OIG and USPS-OIG, I served honorably in the U.S. Air Force from January 2013 to January 2019. I hold a Master of Science in Homeland Security Management and a Bachelor of Arts in Conflict Analysis and Dispute Resolution.

6.      Among other duties and responsibilities, I conduct criminal investigations into alleged criminal violations relating to UI fraud. I conduct interviews, participate in the execution of search and arrest warrants, and gather evidence through the use of various investigative techniques. I am a "federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, and I am authorized to execute warrants issued under the authority of the United States.

7.      The facts in this affidavit come from my personal observations, my training and experience, information obtained from other participating law enforcement agencies, and witnesses. All the opinions expressed in this affidavit are based on my training, experience, and knowledge of this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.      In addition to the facts set forth in this affidavit, from knowledge, training, and participation in financial crime investigations involving fraudulent activities, I know that:

        a.      Those engaged in financial crimes often use a variety of electronic devices such as mobile telephones, iPads, tablets, laptop computers, desktop computers, and digital storage media (i.e. thumb drives and compact discs) to facilitate these crimes. These devices can be used to gather and store the personal identifying information ("PII") of victims; to monitor targeted financial accounts via the internet; to coordinate the conspiracy through the use of phone calls, emails, text and photo messages; to monitor social media accounts and utilize the private messaging features

3

contained within to coordinate and plan their crimes; and to aid in the manufacture of counterfeit documents, credit cards, and identification cards. Such electronic devices are routinely closely kept in the possession of suspects and are often found in their residences upon execution of search warrants.

b.      It is common for persons involved in fraudulent activities to hide the proceeds of bank transactions and records of fraudulent transactions in secure locations within their residences, automobiles, and business and storage facilities for their ready access and to conceal them from law enforcement.

c.      Persons involved in financial fraud often conceal in their residences, safes, automobiles, businesses and storage facilities, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and proceeds of fraudulent activities and evidence of financial transactions relating to obtaining, transferring, concealing, or the spending of large sums of money made from engaging in fraudulent activities.

d.      Those involved in fraudulent activities commonly maintain addresses, telephone numbers, and communications in books, on papers, and in electronic storage media, which reflect names, addresses, and telephone numbers of, and communications with, their associates and co-conspirators in the fraudulent activities.

e.      Information obtained from storage on computers and mobile devices can reveal the times, dates, and contents of electronic communications and the past locations and movements of the devices and their users.  In addition, users of mobile devices commonly back up electronic data stored in the devices (such as electronic communications, contact information, and location data) to their personal computers and cloud storage accounts.

f.      Those involved in fraudulent activities often maintain the foregoing records, communications, and other evidence of financial crimes for long periods of time (in both paper and electronic format), often indefinitely.  Information stored on electronic storage media can be maintained for several months or even years.

### PROBABLE CAUSE

9.      On or about July 17, 2023, a grand jury empaneled in the District of Maryland returned a Superseding Indictment charging **COOLEY**, **BROWN**, and another co-conspirator, Isiah LEWIS ("LEWIS"), with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and six counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A. (*See* Superseding Indictment,

DLB-23-237, ECF No. 7).[1] Specifically, **COOLEY**, **BROWN**, and LEWIS are alleged to have created a scheme to defraud multiple SWAs, including the Maryland Department of Labor ("MD DOL") and California Employment Development Department ("CA EDD"), by submitting fraudulent UI claims using the identities of identity theft victims.

10.     Law enforcement subsequently located **COOLEY** and **BROWN** in Atlanta, Georgia, residing together at the GA RESIDENCE.  On September 14, 2023, investigators executed a search warrant, signed by the Honorable Christopher Bly, U.S. Magistrate Judge in the Northern District of Georgia, at the GA RESIDENCE.  The search warrant, the affidavit in support of, and its attachments are incorporated by reference and attached hereto as Attachment C.

11.     During the search of the GA RESIDENCE, the **ELECTRONIC DEVICES** were seized.[2]  Specifically, the **ELECTRONIC DEVICES** were seized from the following locations:[3]

a.  **TARGET DEVICE 1**: the top right-hand kitchen drawer, opposite the kitchen island;

b.  **TARGET DEVICE 2**: the bottom drawer of a dresser located inside **BROWN**'s bedroom;

c.  **TARGET DEVICE 3**: on top of the dresser located inside **BROWN**'s bedroom;

d.  **TARGET DEVICE 4**: on the floor of **BROWN**'s bedroom;

e.  **TARGET DEVICE 5**: on top of the bed inside **COOLEY**'s bedroom;

---

[1] Arrest warrants were issued that same day for **COOLEY**, **BROWN**, and LEWIS.

[2] **COOLEY** and **BROWN** were the only individuals discovered to be residing at the GA residence.

[3] During the search of the GA RESIDENCE, the **TARGETS** identified their respective bedrooms, which was corroborated by the personal belongings found therein.

f.   **TARGET DEVICE 6**: on top of the dresser inside **COOLEY**'s bedroom;

g.   **TARGET DEVICE 7**: the desk located inside **COOLEY**'s bedroom;

h.   **TARGET DEVICE 8**: the dresser located inside **COOLEY**'s bedroom.

12.   The **ELECTRONIC DEVICES** were later transported to the Internal Revenue Service – Criminal Investigation, 601 E Naylor Mill Rd Unit C, Salisbury, MD 21804. In my training and experience, I know that the **ELECTRONIC DEVICES** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **ELECTRONIC DEVICES** first came into possession of law enforcement.

13.   During the search of **COOLEY**'s bedroom, agents recovered several items, which based on my training, experience, and investigation, I recognized as counterfeiting equipment/activity. Law enforcement recovered: (1) an electronic card reader, (2) an electronic laminator, (3) an ID press, (4) **TARGET DEVICE 7**, (5) **TARGET DEVICE 8**, (6) a printer and ID card template insert, (7) blank card stocks[4], (8) blank check stocks[5], and (9) a shredder. Inside the shredder, law enforcement

---

[4] Based on my training and experience, I know that blank card stocks can be used to create fraudulent credit cards by using a magnetic card reader to encode the cards with stolen credit card information. The stolen credit card information is usually stored on electronic devices so it can be easily transferred onto blank cards.  Further, I also know that blank card stocks can be used to create fake IDs, such as the ones discovered inside **COOLEY**'s bedroom. I know that this is generally accomplished by creating an ID template for a particular state on an electronic device and using a printer, ID press, and laminator to make it appear legitimate.  Further, I know that criminals often use digital cameras, such as **TARGET DEVICE 8**, to take high quality ID or passport photographs.

[5] Based on my training and experience, I know that blank check stocks can be used to print fraudulent checks using a template created on an electronic device.  These templates are filled in by the counterfeiter with false and fraudulent information, including stolen banking information such as routing numbers, and account numbers. Based on my training and experience, I know that counterfeiters often save these check templates on their electronic devices for future use.

recovered, what appears to be, pieces of IDs and other purported fraudulent documents that **COOLEY** is believed to have created and then shredded. The below photograph demonstrates some of the contents found inside the shred bin.



14.     In addition to counterfeiting equipment, law enforcement recovered several fraudulent IDs, approximately 50 checks belonging to others, and a passport and passport application in the identity of victim A.K., which is also shown below.



7

15.     As reflected in Attachment C, **COOLEY** is believed to have been encoding cards with stolen identity information and selling them through various mediums, including Discord, Inc. ("Discord"). [6]  Based on the items discovered inside **COOLEY**'s bedroom, I believe **COOLEY** has also been manufacturing false checks and identification instruments, including fake IDs and passports. In fact, I believe the physical evidence discovered inside **COOLEY**'s bedroom is evidence of a current scheme to obtain money by creating fraudulent IDs, passports, and credit cards.

16.     Based on my training, experience, and investigation thus far, I believe that evidence of this scheme and the **TARGET OFFENSES** will be located inside the electronic devices not only found inside **COOLEY**'s bedroom, but also those found inside of **BROWN**'s bedroom. In February 2021, Google records showed that **BROWN** purchased a magnetic card reader–the same kind used to encode credit cards with information. Further, **COOLEY** and **BROWN** engaged in the charged conducted together, were roommates in Georgia where all counterfeiting equipment was discovered, and are known to have electronically communicated about engaging in criminal activity.  For instance, records obtained from **BROWN**'s iCloud account showed that **COOLEY** indicated he would "make a card" for **BROWN** so that they could go to the casino.  This message is shown below.



_____

[6] Discord is an online instant messaging and voice over internet protocol platform.

17.     Furthermore, during the search of **BROWN**'s bedroom, law enforcement discovered a prepaid UI debit card issued under the identity of J.B.; an identity theft victim in the charged conspiracy.  While the search of the GA RESIDENCE was underway, **BROWN** waived his *Miranda* rights and consented to an interview with investigators. **BROWN** admitted in the interview that he had used the UI debit card issued under J.B.'s identity to purchase goods online.  **BROWN** also stated in the interview that he did not have physical possession of any UI debit cards, but rather took a "picture of a picture" with his cellular telephone of various UI debit cards.

18.     Moreover, as indicated in Attachment C, records obtained from Fountainhead SBF, LLC, show that **COOLEY** obtained a $20,666 Paycheck Protection Program ("PPP") loan for a purported landscaping business.  In August 2021,  **COOLEY** obtained loan forgiveness for the PPP loan and, in doing so, certified that he would "retain all records necessary to prove compliance with PPP rules for four years for employment records and for three years for all other records."  While the search of the GA RESIDENCE was underway, **COOLEY** waived his *Miranda* rights and consented to an interview with investigators. **COOLEY** admitted to not possessing any physical records for his PPP loan and indicated that the PPP records would need to be printed from his email. **COOLEY** provided law enforcement with the email account that he indicated should contain those records, however, law enforcement had previously obtained a search warrant for that email account and found no records supporting a legitimate PPP loan. Therefore, I believe that if these records do exist, they will be contained in the electronic devices discovered in **COOLEY**'s bedroom.

19.     Last, during execution of the search warrant at the GA RESIDENCE, law enforcement discovered three firearms. Inside **COOLEY**'s bedroom, law enforcement recovered a stolen Glock 19X semiautomatic pistol, serial number AFEC533, chambered in 9mm. The firearm was found in plain view, with its serial number apparent, on **COOLEY**'s desk next to some of the

counterfeiting equipment mentioned above.  Another photograph of the firearm was taken once it was

cleared and seized. Photographs of the stolen firearm are shown below.



20.     Law enforcement records show that the firearm was reported stolen on or about July

27, 2023.

21.     During the same search, investigators also discovered a Century International Arms

Micro Draco semiautomatic pistol, chambered in 7.62 x 39mm, from inside **COOLEY**'s bedroom.

The firearm is shown below.



22.     Law enforcement obtained the purchase records for the Micro Draco firearm and learned it was one of two Micro Dracos purchased by **COOLEY** in February 2023 from a pawnshop in Conyers, Georgia. Records showed that the two firearms were purchased in a single transaction by **COOLEY** for approximately $1,900.  Law enforcement did not recover the second Micro Draco at the GA RESIDENCE.

23.     Moreover, as part of the firearms transaction, **COOLEY** executed a Form 4473, *Firearms Transaction Record*, which requires a purchaser to answer several questions, including whether the purchaser is an "unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance." **COOLEY** answered "No" to this question. Following his September 2023 arrest, **COOLEY** informed U.S. Pretrial Services that he used "cannabinoids" monthly, beginning at age 21, most recently consuming the controlled substance the day before his arrest on September 14, 2023.   Furthermore, inside **BROWN**'s bedroom, law enforcement discovered a Springfield Armory XD-9 semiautomatic pistol chambered in 9mm. During **BROWN**'s interview with U.S. Pretrial Services, **BROWN** stated that he consumed "cannabinoids" weekly, with his most recent use being the day before his arrest on September 14, 2023.

24.     While executing the search of the GA RESIDENCE, law enforcement noted the distinct odor of marijuana. Accordingly, I believe **COOLEY** and **BROWN** are frequent users of marijuana.  Based on my training and experience, I know that the electronic devices belonging to drug users and addicts contain evidence of drug use, including communications about using and purchasing drugs, and photographs of the drugs they purchased.

11

## TECHNICAL TERMS

25.    Based on my training and experience, I use the following technical terms to convey

the following meanings:

a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone)
is a handheld wireless device used for voice and data communication through radio
signals. These telephones send signals through networks of transmitter/receivers,
enabling communication with other wireless telephones or traditional "land line"
telephones. A wireless telephone usually contains a "call log," which records the
telephone number, date, and time of calls made to and from the phone.  In addition to
enabling voice communications, wireless telephones offer a broad range of
capabilities. These capabilities include: storing names and phone numbers in
electronic "address books;" sending, receiving, and storing text messages and e-mail;
taking, sending, receiving, and storing still photographs and moving video; storing
and playing back audio files; storing dates, appointments, and other information on
personal calendars; and accessing and downloading information from the Internet.
Wireless telephones may also include global positioning system ("GPS") technology
for determining the location of the device.

b.   Digital camera:  A digital camera is a camera that records pictures as digital picture
files, rather than by using photographic film.  Digital cameras use a variety of fixed
and removable storage media to store their recorded images.  Images can usually be
retrieved by connecting the camera to a computer or by connecting the removable
storage medium to a separate reader.  Removable storage media include various types
of flash memory cards or miniature hard drives.  Most digital cameras also include a
screen for viewing the stored images.  This storage media can contain any digital data,
including data unrelated to photographs or videos.

c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a
handheld digital storage device designed primarily to store and play audio, video, or
photographic files.  However, a portable media player can also store other digital data.
Some portable media players can use removable storage media.  Removable storage
media include various types of flash memory cards or miniature hard drives.  This
removable storage media can also store any digital data.  Depending on the model, a
portable media player may have the ability to store very large amounts of electronic
data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS:  A GPS navigation device uses the Global Positioning System to display its
current location.  It often contains records the locations where it has been.  Some GPS
navigation devices can give a user driving or walking directions to another location.
These devices can contain records of the addresses or locations involved in such
navigation.  The Global Positioning System (generally abbreviated "GPS") consists
of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely
accurate clock.  Each satellite repeatedly transmits by radio a mathematical

representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

26. Based on my training, experience, and research, I believe that **TARGET DEVICE 1**, **2**, **3**, **4**, **5**, and **6** have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, pager and PDA. Based on my training, experience, and research, I believe that **TARGET DEVICE 7** has a unique IP address assigned to it and has the capabilities to function as a computer. Based on my training, experience, and research, I believe that **TARGET DEVICE 8** has the capabilities that allow it to serve as a digital camera. In my training

13

and experience, examining data stored on devices such as the **ELECTRONIC DEVICES** can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

27.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

28.     There is probable cause to believe that things that were once stored on the **TARGET DEVICE 7** may still be stored there, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

    d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

29.    *Forensic evidence.*   As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **ELECTRONIC DEVICES** were used, the purpose of its use, who used it, and when.   There is probable cause to believe that this forensic electronic evidence might be on the **ELECTRONIC DEVICES** because:

   a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

   b.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

15

30.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

31.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

32.     I submit that this affidavit supports probable cause for a search warrant to search the locations described in Attachment A for the records and information described in in Attachment B.


Respectfully submitted,

*Brian Gorman*
Brian Gorman
Special Agent
U.S. Department of Labor Office of Inspector General


Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this ____18th____ day of October 2023.


_____
THE HONORABLE GINA L. SIMMS
UNITED STATES MAGISTRATE JUDGE

16

**ATTACHMENT A**
**(Devices to be searched)**

The **ELECTRONIC DEVICES** to be searched are:

1. a black ZTE Z981 cellular telephone, bearing serial number 325167062536 ("**TARGET DEVICE 1**")

2. a red Apple iPhone displaying a cracked front screen and rear glass ("**TARGET DEVICE 2**");

3. a black Apple iPhone displaying a cracked front screen ("**TARGET DEVICE   3**");

4. a black Apple iPhone bearing serial number GTFP19Y0D43 ("**TARGET DEVICE 4**");

5. a black Apple iPhone displaying a cracked front screen ("**TARGET DEVICE 5**");

6. a black Apple iPhone, model number A1660 ("**TARGET DEVICE 6**");

7. a PowerSpec desktop computer, model G509, bearing serial number G50909102157336 ("**TARGET DEVICE 7**"); and

8. a Nikon D3200 Digital Camera, bearing serial number 3460481 ("**TARGET DEVICE 8**");

which are currently located at the Internal Revenue Service – Criminal Investigation, 601 E Naylor Mill Rd Unit C, Salisbury, MD 21804.

Photographs of the **ELECTRONIC DEVICES** are shown below.

**TARGET DEVICE 1**



**TARGET DEVICE 2**



**TARGET DEVICE 3**



**TARGET DEVICE 4**



**TARGET DEVICE 5**



**TARGET DEVICE 6**



**TARGET DEVICE 7**



**TARGET DEVICE 8**



**Attachment B**
**(Items to be Seized)**

The items to be seized are evidence, instrumentalities, fruits, and contraband concerning violations of 18 U.S.C. §§ 1028A (aggravated identity theft), 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), 1349 (wire fraud conspiracy), 922(j) (possession of a stolen firearm), 922(a)(6) (false statement with respect to a fact material to the lawfulness of the sale or disposition of a firearm), and 922(g) (possession of a firearm by an unlawful user of a controlled substance) (collectively, the "**TARGET OFFENSES**"), involving Michael Cooley ("**COOLEY**") and Alonzo Brown ("**BROWN**") (collectively, the "**TARGETS**") for the period of January 1, 2019 to present, including:

1. Records and information relating to the **TARGET OFFENSES**, including:

   a. Records and information concerning entities owned, controlled, or operated by the **TARGETS**, including payroll records, taxes, and business expenditures;

   b. Records and information pertaining to PPP loans, the CARES ACT, and the U.S. Small Business Administration ("SBA");

   c. Records and information concerning unemployment insurance and the use of unemployment insurance benefits;

   d. Records and information relating to fraudulent financial and monetary transactions, including records of purchases and the items purchased;

   e. Records and information pertaining to financial records, including account information, bank records, bank statements, receipts, notes, ledgers, accounts payable, accounts receivable, financial statements, letters of credit, wire transfers, records of real estate transactions, money orders, cashier's checks, checks, official checks, and check registers.

   f. Records and information relating to the receipt, transfer, exchange, and possession of personal identifying information belonging to individuals other than the **TARGETS**;

   g. Records and information concerning false and fraudulent documents, instruments, identifying information, and counterfeiting materials;

   h. Records and information concerning communications and correspondences concerning the **TARGET OFFENSES**;

   i. Records and information concerning photographs, videos, and other digital media concerning the **TARGET OFFENSES**;

j.   Records and information concerning travel (including by train, plane, or car), including the passports;

k.   Records and information concerning ID and passport photos;

l.   Records and information concerning the location, use, and concealment of proceeds of the **TARGET OFFENSES**;

m.   Records and information concerning federal and state income tax returns, refunds, correspondence with the Internal Revenue Service or the Comptroller of the State of Maryland, or any other state, tax forms, records of online submissions, drafts, and source documentation relating to the preparation and filing of federal or state tax returns.

n.   Records and information concerning the occupancy, residence, ownership, and use of 585 McWilliams Rd SE Unit 705, Atlanta, GA 30315 (the "GA RESIDENCE"), and/or 1513 Southview Dr, Oxon Hill, MD 20745, including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase, or lease agreements, identification documents, and keys;

o.   Records and information evidencing use, possession, and/or ownership of the **ELECTRONIC DEVICES**;

p.   Records and information demonstrating state of mind in relation to the **TARGET OFFENSES**;

q.   Records and information associated with the application, purchase, possession, sale, transfer, or screening of firearms.

r.   Records and information concerning the use of controlled substances, including marijuana;

2.   Evidence of who used, owned, or controlled the **ELECTRONIC DEVICES** described in Attachment A at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, "chat," instant messaging logs, photographs, and correspondence;

a.   evidence of software that would allow others to control the **ELECTRONIC DEVICES** described in Attachment A, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

b.   evidence of the lack of such malicious software;

23

    c.   evidence of the attachment to the **ELECTRONIC DEVICES** described in Attachment A of other storage devices or similar containers for electronic evidence;

    d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the **ELECTRONIC DEVICES** described in Attachment A;

    e.   evidence of the times the **ELECTRONIC DEVICES** described in Attachment A was used;

    f.   passwords, encryption keys, and other access devices that may be necessary to access the **ELECTRONIC DEVICES** described in Attachment A;

    g.   documentation and manuals that may be necessary to access the **ELECTRONIC DEVICES** described in Attachment A or to conduct a forensic examination of each device described in Attachment A; and

    h.   contextual information necessary to understand the evidence described in this attachment.

3.   Records and things evidencing the use of an Internet Protocol (IP) address to communicate with the internet, including:

    a.   routers, modems, and network equipment used to connect computers to the internet;

    b.   records of IP addresses used; and

    c.   records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorited" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses.

4.   As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created, modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

5.   With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the

following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

   a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

   b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

   c. "scanning" storage areas to discover and possible recover recently deleted files;

   d. "scanning" storage areas for deliberately hidden files; or

   e. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

6. If after performing these procedures, the directories, files, or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

7. With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.   If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.   The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.   The investigative team may continue to review any information not segregated as potentially privileged.